THE CITY OF NEW YORK, Respondent, *v.* CHARLES A. BUCKLEY, ÆTNA CASUALTY & SURETY COMPANY, HARTFORD ACCIDENT & INDEMNITY COMPANY and GLENS FALLS INDEMNITY COMPANY, Appellants.

First Department, May 31, 1940.

*Copal Mintz,* for the appellant Charles A. Buckley.

*Harland B. Tibbetts* of counsel [*Murray D. Welch* and *George A. Dickinson* with him on the brief; *Tibbetts, Lewis, Lazo & Welch,* attorneys], for the appellant sureties.

*Seymour B. Quel* of counsel [*Bernard Newman* with him on the brief; *William C. Chanler, Corporation Counsel,* attorney], for the respondent.

Cohn, J. This action was instituted by respondent, The City of New York, on July 8, 1938, against Charles A. Buckley, a former chamberlain of the city of New York, and three corporate sureties on his bond, to recover the sum of $33,633.57 paid by respondent to satisfy three judgments obtained against it by George W. Averell, Charles Shankroff and Edward S. Larwill, respectively. The latter were entitled to receive moneys there-

tofore deposited with the city chamberlain pursuant to a court order, and for the refusal on the part of the city to pay, actions were instituted pursuant to the provisions of a statute (Laws of 1908, chap. 186, as amd. by Laws of 1927, chap. 185) which makes the city of New York responsible for all funds deposited with the chamberlain by virtue of an order of a court of record and accords a right to any party aggrieved to recover any loss to or of such fund.

In the complaint in the present action it is alleged that during his incumbency, Buckley made investments of deposited funds in two mortgages in violation of the court order of deposit and that such investments were illegal because, when made, the mortgages were in default for non-payment of taxes and the properties securing the mortgages were not worth fifty per cent more than the mortgaged amounts.

The bond upon which the surety companies are being sued was executed by Buckley pursuant to section 194 of the Greater New York Charter, the condition of the bond being that he " faithfully perform the duties devolved upon him in the said position of City Chamberlain and all trusts imposed upon him by law by virtue of his office and shall promptly account for and pay over all moneys as such City Chamberlain in accordance with law."

On December 20, 1928, a decree entered in the Surrogate's Court, New York County, directed the distribution of assets of the estate of Elizabeth D. Kingsland. It provided for the payment of $25,000 to Averell and $5,000 to Larwill. It also ordered that if they did not appear and receive the amounts to which each was entitled under the decree within six months from the date of entry thereof, the executors should " pay any of said amounts remaining unpaid, together with the accrued interest thereon, by depositing the same with the Chamberlain of the City of New York to be held by him for the benefit of the person or persons above named entitled thereto and to be paid out by him to such person or persons only by the specific direction of the Surrogate, or pursuant to the judgment of a court of competent jurisdiction, as provided by Section 273 of the Surrogate's Court Act.  *  *  * "

Six months after the entry of this decree and on June 25, 1929, there was deposited in cash with Buckley, as chamberlain, the sum of $36,467.65 for the benefit of Averell and Larwill and other beneficiaries. This fund was lodged by him in an authorized banking institution.

On May 16, 1930, an entry was made in the chamberlain's books indicating that $36,000 of the Kingsland money, which

included the shares of Averell and Larwill, was allocated to a bond and mortgage known as "Berney Bond and Mortgage." This allocation was made because the chamberlain at the time was paying out, pursuant to a court order, an account known as Tucker v. Bingaman fund, which amounted to approximately $180,000 in cash. The $36,000 allocated from the Kingsland estate fund made available that amount in cash for payment on account of the Tucker v. Bingaman fund. Additional cash was made available by similar allocations of undivided interests in the same mortgage to three other accounts with which we have no concern here. The Berney bond and mortgage owned by the city chamberlain since 1920, was in the principal sum of $70,500 bearing interest at five per cent and covered premises 454 Broadway, borough of Manhattan, New York city. From the time of this bookkeeping allocation, the Kingsland fund to the extent of the sum allocated was credited with interest at the rate of five per cent per annum.

On August 24, 1931, another entry was made showing the allocation of $2,600 of the Kingsland estate by an investment transfer to the "Jenfay Bond and Mortgage." This made available cash to honor a payout order against another fund. This mortgage, owned by the chamberlain since January 23, 1928, payment of which was guaranteed by a title company, was in the principal sum of $133,500 and bore interest at the rate of five and one-half per cent, covering premises 163 West Twenty-third street, Manhattan, New York city. This portion of the Kingsland fund was accordingly credited with interest at the rate of five and one-half per cent per annum from the date of that entry.

Some five years later, and on May 11, 1935, the surrogate of New York county signed an order directing the chamberlain to pay to Averell seventy-five per cent of $26,900, Averell having assigned the other twenty-five per cent to Shankroff. The then city chamberlain refused to pay out the money, asserting that the fund had been invested in mortgages which had greatly depreciated in value. Pursuant to the statute heretofore cited, Averell brought an action against the city to recover the sum due him and obtained a judgment for $20,782.38. Shankroff and Larwill likewise instituted suits for their respective claims and as a result the city was required to pay a judgment of $6,964.56 obtained by Shankroff and one for $5,807.97 obtained by Larwill. Neither Buckley nor any of his sureties had notice of any of these three actions.

The city of New York then commenced this suit against the defendants. In awarding judgment to the plaintiff, the trial court held: (1) That each bookkeeping allocation made by the city

chamberlain with respect to the Berney and the Jenfay mortgages constituted a separate investment of the funds of the Kingsland distributees; (2) that investments were prohibited by the court order of deposit; (3) assuming that the court order did not forbid investments, the chamberlain made illegal investments of funds in that the mortgages in which bookkeeping allocations had been made were not, at the time of the allocations, legal investments for trustees as provided by statute. (State Finance Law, § 44-c, as amd. by Laws of 1928, chap. 137.)

We do not deem it necessary to decide whether the court order of deposit in this case prohibited investments by the chamberlain. In our opinion, the bookkeeping allocations in question were not, in fact, investments. They were merely a bookkeeping method of controlling a revolving fund maintained in the chamberlain's office to secure for depositors a reasonable return on their funds. In our opinion there is no basis for the conclusion that when Buckley made these bookkeeping allocations in accordance with the long-established practice in his office, such notations constituted investments in bonds and mortgages of real property.

Defendant Buckley served as chamberlain from January 1, 1929, to October 20, 1933. Upon assuming his duties he found, conducting the business of the office, a staff of about twenty-five men who, with two exceptions, were civil service employees. There were no investigators, title searchers or real estate appraisers among them, nor was there any budgetary provision for such service. On deposit there were approximately 40,000 accounts aggregating upwards of $12,000,000. During his tenure of office Buckley received and paid out annually more than $5,000,000.

The chamberlain's office had been organized into two divisions, the city treasury division and the division of court and trust funds. The latter division received money only pursuant to court orders. These deposits, depending upon the wording of the court order, fell into two classes: (1) funds which the chamberlain was directed to invest in a particular type of security, such as guaranteed mortgage certificates; (2) funds which were deposited without a direction to invest in any specified type of security, or a direction to hold without investment.

Investments as such, for the account of specific funds embraced in the first group, were made by the chamberlain only where the order affirmatively directed or authorized such specific investments. Each was separately regarded and had to stand upon its own bottom. A separate entry was made in the investment book kept for that purpose in the name of the specified beneficiary and was treated as such beneficiary's property. When such fund was ordered paid

out by the court, it was not cash but the investment itself which was physically turned over to the person entitled thereto. The investment was never transferred from one account to another, and each investment made was charged with the statutory fee of one-half of one per cent on the amount invested. (Civ. Prac. Act, § 1561, subd. 2.) Certificates issued by the chamberlain (see Rules Civ. Prac. rule 32) from time to time showing the state of such account reflected only the specific investment held for that particular account.

The second class of funds, which includes the funds of the Kingsland distributees, when received by the chamberlain, were placed in a bank or trust company duly designated by the State Comptroller and were commingled with other deposits made pursuant to similar court orders. Thereafter, as occasion arose, allocations were made to bonds and mortgages owned by the city chamberlain whenever payout orders came for other accounts, the money to pay out being drawn from the general funds and the bookkeeping allocations being made to supplant the ones cleared up as the result of compliance with a payout order. The bonds and mortgages in which the allocations were made were always in the name of the city chamberlain and, other than a bookkeeping entry, there was no formal instrument of assignment or participation in the name of those to whom allocations had been made and no advice of any allocation was ever sent to the distributees. No statutory fee was exacted as in the case where an original investment was made. When certificates were issued by the chamberlain showing the state of the account, they ignored the allocations and certified the funds as being held in cash. The specific securities against which allocations were made were not segregated or earmarked as belonging to any particular fund beyond the mere bookkeeping entry. The allocation to an account of an interest in a bond or mortgage entitled such account to interest as of the rate specified in the bond and mortgage. When interest was not paid, the accounts, nevertheless, received the stipulated interest, the same being paid out of what was generally known as the real estate surplus account or the contingent surplus account which the chamberlain carried for that purpose. This surplus account had been built up during preceding years in the main as the result of foreclosures of bonds and mortgages held for the account of the court and trust fund in the name of the city chamberlain. It consisted of operating surpluses realized during such periods as the chamberlain's office operated property, and of profits realized upon sales. In 1932 this fund, it appears, amounted to $46,452.39. Depositors thus bore none of the risks

and received none of the profits other than the stipulated interests from these general investments. All profits went into the surplus account and all defaults were made good to the depositors out of this fund.

Such was the procedure which was followed in allocating the Kingsland estate fund to an interest in the Berney and in the Jenfay mortgages. Bookkeeping allocations like those involved in this action were made, not with the intent that the deposit owner should receive the allocated fractional share of the specific mortgage, but only for the purpose of crediting the account with the *pro rata* share of the interest payable thereon and so that the principal amount of the allocation should be repaid to the deposit owner in cash. When the chamberlain was ordered to pay out a particular fund (other than one in which a specific investment had been made as directed by court order), it was the practice to make payments in cash, and by bookkeeping entries, allocating the securities, or a part interest thereon, to some other fund or funds. These allocations constituted the so-called " investment transfers."

The investment transfer practice, which was discontinued in March, 1935, had been in operation for almost three-quarters of a century. That it was in effect as early as 1880 and had not been disapproved, appears from the opinion in *Chesterman* v. *Eyland* (81 N. Y. 398). Undoubtedly, the practice was started and carried on for the purpose of obtaining for depositors a greater return on the funds than the small rate of interest ordinarily paid by banks on demand deposits.

The system and everything that went with it was there when Buckley became chamberlain. The court and trust fund division of his office owned a portfolio of investments which it had acquired over a long period of time. Included therein were about one hundred bonds and mortgages, government and municipal bonds, some of which had been in the office during the tenure of many different chamberlains for a period of over twenty years. The Berney mortgage and the Jenfay mortgage were in this group. The Berney mortgage had been acquired by a former chamberlain in 1920 and the Jenfay mortgage was purchased in the year 1928.

The bookkeeping allocations did not constitute the making of distinct and separate investments for any particular fund on deposit with the chamberlain. The only purpose of the bookkeeping items was to make a record of the specific rate of interest to be paid on the funds in the chamberlain's custody. Nothing else was intended. The Kingsland estate distributees, as well as all others entitled to the various funds held by the chamberlain, never

expected that the sum deposited would be returned in the form of investments, such as fractional interests in bonds and mortgages. They believed, as they had a right to, that the deposits would be paid in cash, regardless of the manner in which the chamberlain kept the general funds or the method he employed in keeping his books. As for the chamberlain, the transfer practice as executed over the long period of years evidenced clearly his intention to pay each deposit in cash. Every step taken by him negatives plaintiff's claim that the bookkeeping entries were intended as, or were in fact, investments. Accordingly, we do not think it equitable or just that such bookkeeping allocations should be so denominated and thus result in charging the former chamberlain with violation of the law.

It has been held that the bookkeeping allocations by the chamberlain made under similar circumstances do not amount to an investment in the legal sense of the term. In *Thurston* v. *Wilbur Trust Co.* (7 Misc. 392, Court of Common Pleas, General Term [1894]) it was said:

"No such investment as is contemplated by the Code has been made of the fund in question. The money has been properly, so far as anything appears to the contrary, used by the chamberlain in such a way as to secure a substantial income. It has been mingled with other funds in his hands in the purchase of different mortgages for large amounts, but, as I am informed, the chamberlain is prepared, at short notice, to substitute other moneys on deposit with him for any particular fund so employed, and thus converting the latter into cash, hold it subject to the disposition of the court. His investment of the moneys of these infants is, therefore, of a temporary and not permanent character.

"As no 'permanent investment in the name' of the infants, as required by section 1581 of the Code, has so far been made, the share of each must be deemed to be still uninvested and subject to the order of the court * * *."

A finding to the same effect was made in a well-considered opinion by Mr. Justice HAMMER in the case of *City of New York* v. *Buckley* (N. Y. L. J. Sept. 17, 1936, p. 719, not officially reported). Decisions of the Court of Appeals cited by respondent did not in any instance pass upon the specific question here involved.

Admittedly, an original purchase of a mortgage is an investment, and where a chamberlain makes such an investment in securities which are not legal investment for trustees, without a specific direction of the court (State Finance Law, § 44-c, as amd. by Laws of 1928, chap. 837), he is guilty of negligence and wrongdoing for which he might be compelled to respond in damages. However, no such misconduct was established against appellant Buckley.

As already indicated, the Berney and Jenfay bond and mortgages were a part of the assets of the division of court and trust funds of the chamberlain's office when Buckley became chamberlain. These investments were still part of the assets when this defendant left the office of chamberlain. The fact that at the time the allocations in this case were made, the Berney and the Jenfay mortgages were no longer as valuable as when originally acquired by the then chamberlain was admittedly no fault of Buckley's. A mere showing of shrinkage in the value of bonds and mortgages held by the city chamberlain, due to conditions beyond his control, such as the real estate depression, and not due to a breach of trust, his negligence or his malfeasance, is insufficient to cast a personal liability on the city chamberlain. (*Hallenbeck* v. *Hallenbeck*, 240 App. Div. 780; affd., 264 N. Y. 445; *Banks* v. *Jacoby & Sons, Inc.*, 246 App. Div. 841.)

We think, too, that Buckley, as city chamberlain, is free from liability because, in good faith and in the exercise of reasonable diligence in the discharge of his duties, he relied upon long-established practice and custom in the chamberlain's office, the written opinion of the corporation counsel and the sanction of the State Comptroller.

The proof shows that in 1916 the then chamberlain who had found this practice in vogue discussed it with the justices of this court, interviewed the State Comptroller and in 1917 consulted the corporation counsel concerning it. As a result of these conferences and upon a written opinion rendered by the corporation counsel the practice was continued. In that opinion the chamberlain was advised as to the liability of the city in connection with the so-called investment transfers. The chamberlain had sought the counsel of his official legal adviser in a situation which involved a mortgage acquired by the office some years before for the sum of $42,500 upon real estate which was assessed at only $47,500 and appraised at $44,000. The corporation counsel's attention was specifically called to the fact that the amount of the loan exceeded two-thirds of the value of the property. The city's attorney advised the chamberlain to adhere to the practice theretofore adopted, and since followed, " of paying out in cash, on order of court, funds invested in such a mortgage and substituting as investments therein funds standing to the credit of other beneficiaries." This written opinion has been on file in the chamberlain's office and the advice therein set forth had been followed down to 1934.

Under the provisions of the Greater New York Charter in effect until 1938 (§ 255), " The corporation counsel shall have charge and conduct of all the law business * * * in which The City

of New York is interested * * *. He shall be the legal adviser of * * * the various departments * * * and it shall be his duty to furnish * * * all such advice and legal assistance as counsel and attorney in or out of court as may be required * * *." The section also prohibits the head of a department from employing any other attorney. Thus, the chamberlain was compelled to take advice from the corporation counsel alone and was obliged to follow it.

That is precisely what Buckley and his predecessors in office did. It is not contended by appellants that competent legal advice makes lawful that which is unlawful, but they urge, and we think properly, that where liability is grounded upon absence of due care and prudence, a showing that appellant Buckley acted in reliance upon competent legal opinion supplied by plaintiff's counsel is an important consideration upon the question as to whether he was negligent or careless in the performance of his duty.

Moreover, the proof established that examiners regularly employed by the State Comptroller had, and maintained, as required by statute (State Finance Law, § 4, subd. 8),* active supervision of the administration of all court and trust funds paid to the city chamberlain. No exception was ever taken to Buckley's conduct in connection with his administration of these funds.

The chamberlain thus had not only the considered and settled procedure of his office to guide him but an opinion from the city's own attorney and the sanction of the State Comptroller's office.

The practical construction of the law relating to investments and allocations of investments by the chamberlain's office, as approved and acquiesced in by the official authorities over a long period of years, is of controlling importance in its interpretation. (*Matter of Smith*, 279 N. Y. 479, 486–488; *People ex rel. Williams* v. *Dayton*, 55 id. 367; *City of New York* v. *N. Y. City R. Co.*, 193 id. 543, 548, 549; *Power* v. *Village of Athens*, 99 id. 592.) In *Matter of Smith* (*supra*) the Court of Appeals, in an opinion by Lehman, J. (now Chief Judge) (at p. 488), said: " None the less, a construction [of a statute] adopted consistently and not casually by the legal department of an official agency and by the courts, and which has been accepted without challenge over a period of years by the public, may not be lightly rejected as unreasonable. It indicates plainly what a fiduciary reading the statute with reasonable care would understand from its language, and that is the way in which the courts should construe a legislative definition intended to guide the conduct of fiduciaries. * * * "

---

* New State Finance Law was enacted by Laws of 1940, chap. 593. See § 8.— [Rep.

In *City of New York* v. *N. Y. City R. Co.* (*supra*, at p. 548) the court said: "Under these circumstances the practical construction of the parties by a uniform course of conduct under all administrations of the city government for more than forty years is of controlling importance."

The city urges that satisfaction by the city of the judgments recovered by Averell, Shankroff and Larwill entitles it, *ipso facto*, to recover the amounts of those judgments from defendants for breach of trust on the part of Buckley. We find no merit in this contention.

These judgments were obtained against the city by virtue of chapter 186 of the Laws of 1908, which reads as follows:

"Section 1. The city of New York and outside thereof, each county of the State shall be responsible for all funds or moneys deposited with the chamberlain and treasurer thereof respectively by virtue of a judgment, decree or order of any court of record in this State, and an action to recover any loss to or of such fund may be brought against the city or county respectively by any party aggrieved or by the Comptroller of the State of New York in a court of competent jurisdiction."

By chapter 185 of the Laws of 1927 the following amendment was added: "No liability shall, in any event, attach to a county treasurer or city chamberlain because of a surrender made by him in good faith in accordance with the direction of an order of such court."

Recoveries against the city were predicated upon statutory liability, while the chamberlain's liability must necessarily rest upon common-law principles. The liability "is that of the city, not of the official, unless he has been guilty of gross negligence or malfeasance." (*Banks* v. *Jacoby & Sons, Inc.*, *supra*. See, also, *Hallenbeck* v. *Hallenbeck*, *supra; Pfeffer* v. *Lehmann*, 255 App. Div. 220, 222.) The statement contained in the case of *Nepola* v. *City of New York* (246 App. Div. 15), which might be construed as an expression to the effect that the liability of the city and of the chamberlain are coextensive, was obviously dictum and is not controlling.

The measure of the chamberlain's responsibility was tersely set forth by the Court of Appeals in the recent case of *Mills* v. *Bluestein* (275 N. Y. 317), where (at p. 322) LEHMAN, J., said: "As custodian of the moneys paid into court, the City Chamberlain is, at all times, under a duty to exercise, at least the same care and prudence which a reasonably careful man would exercise in the management of his own affairs. That is the test which must be applied when any act done by him is challenged and he is charged with dereliction of duty. His responsibility is, it has been said,

similar to that of a trustee to whom the custody and investment of trust funds have been confided. (*Chesterman* v. *Eyland*, 81 N. Y. 398; *County of Tompkins* v. *Ingersoll*, 81 App. Div. 344; affd., 177 N. Y. 543)."

Buckley has been held responsible in damages for acts performed in accordance with the long-established procedure in the office of the city chamberlain, and with the sanction and approval of the controlling authorities. If it were established that Buckley was guilty of negligence, breach of duty, misappropriation or fraud, he would undoubtedly be liable. Upon this record we find that Buckley has committed no moral wrong, had no improper motives or fraudulent intent; nor in the acts complained of was he shown to be guilty of negligence, breach of duty or other malfeasance. There is no proof that he did not faithfully perform and fulfill the duties and trusts of his office. Accordingly, we hold that he may not be held liable in damages to respondent. As there is no basis for recovery against him, it follows that there may be no recovery against his sureties.

The judgment and order appealed from should, accordingly, be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., GLENNON, UNTERMYER and CALLAHAN, JJ., concur.

Judgment and order unanimously reversed, with costs, and the complaint dismissed, with costs. Settle order on notice.